And a good morning, everyone. We are changing our calendar this morning to accommodate one of the challenges that we are facing in the state of California, and that is the $1.29 million verdict to $150,000. And it is our contention that the Seventh Amendment required that when the district judge granted the motion for a new trial and damages, that a fair trial would commence. And that second trial was not fair. And there were several evidentiary errors that we pointed out with regard to the second trial. Can I ask you one question? Yes, Your Honor. You did not ask for a underlying liability issue. No, we believe the issue of damages. First, we believe that the court can look back to the first trial and reinstate that judgment. And to the extent you do not want to reinstate that judgment, then a third trial on the issue of damages should commence because the second trial on the issue of damages is not a fair trial. I'm just thinking out loud. Isn't the Seventh Amendment satisfied by your getting a jury trial on the issue of damages? The Seventh Amendment required that once the judge determined in his judgment there was insufficient evidence that a new trial be granted. But embodied in the Seventh Amendment is that there was a fair trial. What was unfair, specifically unfair, about the second trial? Specifically, the appellee, the defendant in the underlying matter, was permitted to bring out evidence and cross-examine witness on the issues of alternate causes of the illness. The issue was Ms. Smith contended that mold was the cause of her aggravation of what was a nonexistent asthma issue. And on cross-examination of several witnesses, in the choosing of the Ms. Smith's objections, the judge permitted the defendant to question about COPD, to question about asthma, all these alternate causes. I thought, correct me if I was mistaken, that the judge was concerned that she had pre-existing conditions and that the jury should consider those pre-existing conditions in determining a fair and appropriate amount of damages. So why isn't that evidence relevant on the issue of damages? Not on the issue of causation, on the issue of damages. Well, to the extent the judge wanted the jury to hear those alternate causes, there was testimony that had it brought out to the jury where experts and doctors determined that no, it wasn't the asthma, it wasn't her smoking from ten years ago. It was the mold that caused the illnesses that she's suffering from now. So to the extent the court wanted the jury to determine or hear about the alternate causes, it went unrebutted because the judge prohibited the plaintiff's counsel from bringing in the testimony where specifically Dr. Shapiro, Dr. Grunfath determined that no, it wasn't these other things. It was mold. And every time she attempted to bring in the testimony, it was objected to, and the judge said, oh, that went to the issue of causation. That doesn't go to the issue of damages. So it was really rebuttal evidence you wanted to introduce. Yes. Yes, Your Honor. And you can't leave that sort of evidence unrebutted. Because if you're saying, hey, no, it was theopathy and asthma, she's entitled to rebut by saying, no, it was mold. And here's the testimony of two physicians that said, no, it was mold that was the cause of her symptoms today. So you're saying the trial judge prevented you from bringing in evidence of causation to rebut the evidence of aggravating circumstances? Specific causation, yes, to rebut. He did. And we pointed out very succinctly in our brief where specifically when it came to the trial testimony of Dr. Grunfath, every time we attempted to introduce evidence that he was saying, no, it was mold, it wasn't theopathy, it was objected to and sustained. That evidence was cut off from the jury being able to hear it. And our contention is because it's clear from the record that that second trial went unrebutted and counsel was permitted in closing to say, oh, there was no evidence it was the mold. It was just your asthma and her smoking. No doctor testified that it was mold.  If there was evidence before the jury had various pre-existing conditions, isn't it appropriate for the jury to consider those pre-existing conditions, COPD, she smoked for 10 years, et cetera, on determining whether the mold aggravated those conditions or whether the mold caused the conditions? Of course. That's always something that can be considered is whether or not there were pre-existing conditions. That's a defense that the... I have no problem with that. No, Your Honor. But if you're going to permit that, the problem is if there's alternate evidence and it's evidence of the mold being the cause, it has to be able to come in and the jury must be able to assess it. And we believe because that was not done in the retrial on the issue of damages, this is evidence that the court would abuse its discretion and its remitter. If we were to grant... I'm sorry, two questions for you. You said there were two big issues with the second trial. Yes. What was the second issue? Well, it was one big issue with regards to the second trial and it was the fact that that evidence went unrebuttal. Rebuttal evidence was not permitted. Yes. And so if we were to grant a third trial, would it be on damages and liability or just damages? It would be on damages. But damages were to the extent the defendant wants to introduce evidence of alternate... We're talking here about specific causation. To the extent he wants to explore other alternate pre-existing illnesses, you must permit the plaintiff to be able to bring in that rebuttal evidence. What would be your argument? Is your argument yes, she had these pre-existing conditions, that's fine. But her current condition was caused exclusively by the mole presence in the apartment. Well, we don't believe she had COPD. That's never a contention that was brought up. We believe that... You dispute that. We dispute that, of course. And we had medical testimony that it was not COPD that she suffered from. What was in her history was a minor flare-up of asthma every once in a while. That's a far cry from the condition she's in today that we contend was caused by mold. It's a complete change in circumstances. And witness after witness after witnesses, witness was able to recall how she was before she began working in the IRB building and how she was after she began working in the IRB building. You dispute that the other side is perfectly right when it brings up evidence that she was a smoker for several years, for 10 years, or whatever it was, and that she had an asthmatic condition. You don't dispute that. I don't dispute that they're entitled to do that. But we're also entitled to introduce testimony that it is mold that caused it or not. And we cited a Delaware case that was very similar in circumstances to Ms. Smith, where, you know, you meet your plaintiff the way they are. And just because somebody had a minor asthma condition before doesn't mean you're not on the hook for the aggravation that was caused by the moldy environment. And it's our contention, Your Honor, Your Honors, that because the second trial, even the appellate, the appellee agrees that the second trial was unfair, the court can look back to the first trial and see if there was an abuse of discretion in the remitter to begin with, because there was a jury who has already determined all of these issues and determined the extent of her damages and has said, hey, there was $390,000 in economic damages, $900,000 in non-economic damages. This court, to the extent you think a third trial is not necessary, you can get back into the first trial and look there and see whether or not the court abuses discretion in its remitter. You're asking us either to affirm the first verdict or give you a third trial just on damages. Yes. That's exactly what we're asking for, because I think it's clear that that second damages trial was unfair in the evidentiary rulings of the judge that prevented the plaintiff from giving the jury the full scope of the opinions that mold was the cause of the damages. And with regard to, we also raised the issue of, to the extent the... The argument, I mean, it was an argument that you could make, for example, in closing arguments to the jury, that she had several conditions, but ladies and gentlemen, the sole cause of her difficulties was the mold in the building. You could not make that argument to the jury? There was no evidence. He didn't permit the evidence to be tried on that issue. You can only make your closing arguments based on what was tried. And the defense was able to make those closing arguments because they were able to get that evidence in on her pre-existing asthma and her COPD. And he just... He went with it. And the jury was able to hear all, you know, this was pre-existing. There's no evidence at all that it was mold. But it wasn't... The evidence wasn't there because the trial judge determined that that evidence wasn't going to come in. Going back to Judge Estrepo's point, this is either a new trial on everything or do we just reinstate the original verdict? A new trial on damages, Your Honor. Yes, a new trial on damages or reinstate the original verdict, which I believe there's more... We've briefed that there was more than sufficient evidence to support that first trial. Without allowing evidence as to causation. As to specific causation, whether... To the extent the defendant wants to argue that there was COPD and pre-existing asthma, you must permit the plaintiff to be able to argue that, no, it was mold, and bring in that expert testimony. Would you bring it in by way of rebuttal evidence or in your case in chief? Or does it matter to you? I don't think it matters because the jury will hear the evidence, Your Honor. Thank you. Thank you very much. Mr. King? Yes. I'm sorry, Judge Vineski. Well... Good morning. Judge Vineski, are you there with us? Yes, I'm hearing you. Are you hearing me? Yes. We got you just fine. Thank you. All right. Mr. King? Good morning. Your Honor, as I represent Mr. Sidney Cates, who is the owner of a building here in St. Thomas that was known as the Marshalls Building. And this case arises out of a claim of a mold illness. There were a number of problems presented in the first trial of this action. And that is the reason why we filed a cross appeal. We filed a cross appeal because there was insufficient evidence upon which any jury could find liability on behalf of Mr. Cates. There was a complete failure of proof. Now, we submitted a laundry list of items, of things that were wrong with the first trial. Part of it had to do with the admission of expert testimony, where that expert testimony did not comply with Rule 26. The plaintiff had failed to provide the disclosures with respect to a Mr. Weiner, who was their general causation expert, and failed to provide any information with respect to Mr. Thibodeau, who was a liability expert. The defense was not permitted to take the depositions of either of these two experts. There was something that's strange that happened in this case. And that is the court had initially joined these two cases, the Smith and the Richards cases, for all purposes. And then for some reason that I believe I know the reason, the court wanted to, my personal belief is that the court wanted a determination from a single plaintiff case so that the court could have collaterally stopped us from defending on the multiple plaintiff case with 33 separate cases. And in the court attempting to orchestrate that, the court did a gross disservice to the defense and a gross disservice to the defendant. Mr. Cates was not permitted to come to the Virgin Islands and defend that matter because Mr. Cates was having a total knee replacement, and the court determined that to be a cosmetic surgery. And we literally had to try the case with a chair, an empty chair beside us as a defendant. There were other issues that are outlined in the brief, some of which I'll mention here. Could you focus on the res ipsa issue? Yeah. There was a complete absence of proof. First of all, in order for you to focus on the res ipsa, I have to say just a couple words about causation. The plaintiff was allowed to bring Dr. Weiner in as a general causation expert. A person who had never examined the plaintiff, had never seen plaintiff's medical records, and had never provided a report under Rule 26 had done nothing, but he was allowed to testify, the court permitted him to testify over our objection as a general causation expert. And he was permitted to testify that mold was capable of causing the type of complaints that plaintiff had in this case. Listening to Ms. Lawrence, you actually prevailed on the causation issue, didn't you? No, I didn't prevail. Had I prevailed on the causation issue, we would have never been to a jury. Either causation or there's an aggravation of an existing condition. No, there's neither. That's the problem. The problem is, had I prevailed on the causation issue, then there would have been nothing to send to the jury because they were going to complete failure proof. Here's what you had. You had a person who was coming in testifying to general causation and only testified that it was capable of causing this. You had a plaintiff who was not allergic to mold at all. Not by any testing, not by any doctor. So then you had a person who had an exacerbation, some kind of thing that happened that made this person sick on July 2nd, 2008. You do have a jury verdict that's found against you. Well, there's a reason for that. The jury verdict was that her condition was caused by the mold in the building. Yeah, but the jury, just like a judge, does not have the kin to make the determination of liability so solely based on the self-serving recantations of the plaintiff. There must be medical testimony that ties the knot of that causation. There must be a reasonable medical certainty that you come from the point of we have general causation to specific causation. No... The trial judge didn't prevent you from presenting rebuttal evidence. Your Honor, what happened in this case is it's not a matter of rebuttal. It's a matter of what proof exists in the first instance to go before the jury. And in this case, there was no proof of specific causation. And in Paoli and the other cases, they said you've got to have the proof of the specific causation. You can't just depend upon a plaintiff's ipsy dixit. Isn't that what the trial judge said? There was no proof of actual causation? But there may be proof of aggravating an existing condition. No, there was neither. There was absolutely neither because there's no medical testimony to make that leap. To make that tie. If there were that medical testimony, then you wouldn't have me arguing this right now. Because then we would have had the general causation and the specific causation. I would have been arguing that the medical testimony shouldn't have been permitted because of the Rule 26 violations, because of the failure of discovery. But I wouldn't be saying that the evidence was lacking at all. And in this case, there was a total lack of evidence of a connection of a specific causation. According to the judge's interpretation of res ipsa loquitur. But that interpretation of res ipsa loquitur is not supported by the case law, not supported by the restatement, not supported by the elements of res ipsa loquitur. Res ipsa loquitur requires, and I don't want to get this wrong, so I'm going to go to my brief and the arguments that were presented there with respect to res ipsa loquitur to cite the elements of res ipsa loquitur. Now, those elements are three. The first element is that the event itself is the kind that ordinarily does not occur in the absence of negligence. Here what we had is, what is the event? We had an asthma attack. That event does occur in the absence of negligence. In fact, all medical testimony in this case says that there were a number of triggers to asthma. And in Mrs. Smith's particular case, her triggers included she was allergic to dust, she was allergic to cat hair, cold air at her office would cause her to have asthma attacks, stress, and a number of other conditions, none of which were related to mold. She also had COPD, which also contributed to her having asthma attacks. We had nothing with respect to the events which would lead one to the conclusion that her asthma attack is something that would not occur in absence of negligence. Now, other responsible causes. You have to exclude other responsible causes in order for you to have res ipsa loquitur. You got all this in front of the jury, didn't you? Your Honor, this is a legal question, and it's a question that the judge raised sua sponte. It's not something that was raised by either lawyer. This is something with the judge in reviewing my Rule 29 wrong case. That was last week. I just got off another trial, and I'm kind of dizzy and tired. We just got off a two-week trial with Judge Sanchez, so I'm thinking Rule 29 rather than Rule 59. But what I'm basically saying is this is something that the judge came up with after the fact to try to justify not granting the motion to dismiss. What was presented to the jury was a straightforward negligence case. So it was a straightforward negligence case. Some of the evidence should have never come in. Some of the evidence should have come in that the judge kept out. The judge kept out information that should have been in because he was trying to orchestrate a result. Trying to orchestrate a result, but the result he ended up orchestrating was not the intended result. It didn't end up being a result that was a minor verdict. It ended up one which was a major verdict that didn't make sense. And therefore, you ended up with a remitter. You ended up with a remitter because the judge knew that this evidence was not supported by any fact in the case. To agree with you, what is the remedy? Well, the remedy is to dismiss this matter. To dismiss this matter because in the first, we should have never gone to a jury in the first instance. So it's very extreme. Well, I'm going to give you another order. Do you know that you're both asking for a new trial? Well, no, I'm not. Absolutely not. Here's what I said, Your Honor. I said dismiss her action. If you're not going to dismiss her action, and I thought if we needed a new trial, we should have a new trial on every issue. You said dismiss the first case. As a matter of law, we should have won the first case. And if we won the case and that disposes of this matter, we don't have a case that's properly before you, Your Honor. You should have never gone to the jury. Exactly. Exactly. But yes, it is. And I asked something else separate and apart from that. I said if Your Honors aren't going to do that and you are going to order a new trial, then there ought to be a new trial on everything. So let's fight about it. But I don't even think that's appropriate. What I said was plaintiff asked for and got what plaintiff wanted. Plaintiff wanted a trial on damages. Plaintiff got a trial on damages alone. Plaintiff, in this case, throughout the entire case, case number one, case number two, failed to comply with the rules of discovery. Wait a minute. I didn't get the impression that plaintiff wanted a new trial on damages. Plaintiff was very content with the first result. Well, I didn't know what plaintiff was, but plaintiff was not entitled to keep that for the laundry list of reasons that we talked about. The second trial, however, plaintiff is now requesting a new trial based on damages. But they're not really entitled to that. And the reason why they're not entitled to that, they got what they asked for. They got a trial on damages. Again, plaintiff is failing to do what it's supposed to do. Plaintiff has never given us the discovery. I'm looking at this a little differently. I didn't think plaintiff was asking for a new trial on damages. Yes, plaintiff. That's precisely what plaintiff was asking for. I thought that was the judge's decision because the judge thought that the damage award of the first jury was excessive. Right. But we're now to the point where you and I are discussing, Your Honor and I are discussing, well, what is plaintiff requesting right now? And that was my understanding of what your question was. Plaintiff wants a reinstatement of the original verdict. Well, plaintiff may wish many things, but that doesn't make it legally sound, nor does it make it justifiable. What about her argument that she was prevented from presenting evidence that the mole caused the condition that she was complaining about? Well, first of all, every plaintiff has to prove something, but you have to do that in accordance with the rules. You've got to present your expert. You've got to give a copy of their opinion. It has to be signed by the expert. You have to give it to the defendant. The defendant is supposed to be able to question that expert under oath to take that deposition to prepare the matter for trial. Plaintiff did none of this, not in case one, not in case two. Plaintiff failed in every respect to comply with the discovery rules. The district court in case two, the second case, held that because plaintiff failed on the expert to adhere with the expert rules, what the court was going to do is limit the testimony to that of a treating physician, which means that a treating physician cannot use, cannot talk about specific causation if it's not within the confines of the information that would be available to a physician as a treating physician. So they were limited, but the limit came from plaintiff's failures to do... Proposed limits. Exactly. It was all plaintiff had to do to get the evidence they wanted before the jury was to comply with the expert discovery rules. That is, give us a copy of the report. Let us take the deposition. Move the court to open up the discovery such that they can reopen. They did that on one occasion in a new trial almost a year and a half after discovery time had closed, and the court found that that was inexcusable. The plaintiff here has... There's been a number of failures, and those failures are all on the part of plaintiff and plaintiff's counsel to do the things that the rule requires. So any failure to allow them to produce the evidence was the direct result of plaintiff's failure to comply with the discovery rules. It was no poor judgment on the part of the court. There was no order that was inappropriate. The court said, look, you want to present this evidence as to specific causation. You never even offered an expert on general causation in the first trial. We of the court permitted you to put in evidence of general causation without having provided a report. Now you want to turn around and present evidence of specific causation that you didn't do when the court gave you this nexus by virtue of the use of res ipsa loquitur, which is improper, to try to sustain your first verdict. But that would... A verdict that was unsustainable in the first instance. What was your objection that she had not submitted or the plaintiff had not submitted an expert report? Never. Regarding causation. Never. In the entire... Never in case one, never in case two. No economic report. No nothing. And we're forced... Defendant has been hamstrung from the first trial. From the very first trial. We're sitting in with an empty chair for a client. We're sitting here, my client's in Massachusetts, over here by e-mail trying to e-mail me about jury selection. He's trying to e-mail me the help. And then once we finally tried the other case where he was present and we got the discovery that it was another case that was joined with this one that had been removed with the 33 plaintiffs, once we had that full set of information, the jury held nothing. Zero. Zilch. Nada. Nothing. They held no liability. I don't have your time, Mr. King. Can I... And I appreciate you allowing me to... Thank you. Give me a moment, Mr. King. Has anyone been asking any questions of Mr. King? I have no questions. Thank you, Judge Fuentes. Thank you, Mr. King. Thank you both so much. All three of you so much. Thank you. Thank you, Ms. Lawrence. Perhaps you can touch immediately on that issue that you wanted to get evidence of causation in the second trial but you never submitted an expert report. Well, Your Honor, I think we're looking at two records here apparently because our evidence is quite different than Attorney King's recollection. So James Thibodeau was a general causation expert that was presented in the first trial. Weiner was also a general causation expert. There was also specific causation entered in by Dr. Shapiro, Dr. Grundfast. So the idea that there was no specific or general causation, that's defied by the record itself. There was that testimony given, expert testimony given. The issue with regard to the treating physicians, which has been a recurring issue in this jurisdiction, is the court erroneously seeking to limit what a treating physician can testify to. Is it your opinion that a treating physician can testify as a de facto expert with respect to causation? I'm sorry, go ahead. That's the question. Well, treating physicians are experts. Rule 26 is specific. Rule 26A to B has non-retained experts. Rule 26A to C has retained experts. Only retained experts, persons classified as the hired guns of a party, are required to give reports. Treating physicians, people who are not retained, are not required to give a report. All that's required is a summary of their opinions, which was done. But the idea that if a treating physician, in the course of his treatment, he has to make a diagnosis, he has to think what is causing this person to be ill. To arbitrarily bar a treating physician from opining as to causation, when that goes to the foundation of the practice, you have to eliminate causes, do a deferential diagnosis, figure out what is causing this person to be ill. Of course a treating physician is qualified to testify as to these things, and Dr. Grundfast did so. He testified that it was mold that was causing this illness and recommended that she leave the building. But it's the same. In order for them to diagnose somebody, they have to figure out what's causing the illness. That's the whole point of a treating physician. The reason why the requirement is there for retained physicians is because those are the hired guns. These are the people who need reports. You can go out and find some sort of rebuttal person. But these physicians aren't paid by plaintiffs at all. You actually basically won your first trial as to causation. I mean, the second trial was just a trial as to damages. We won. It was a trial as to damages with the caveat that the defendant was permitted to bring in all this evidence that it was COPD and smoking that went unrebutted. The plaintiff was cut off from saying, no, here is my testimony from Dr. Grundfast, Dr. Shapiro, that went to the heart of the fact that it was mold that caused her illness. That's point number one. Point number two, the issue arose in the second trial with regard to Dr. Shapiro's opinion. Dr. Shapiro is a non-retained physician. He was a treating physician. He continued to treat the plaintiff in between the time span of the conclusion of the first trial and when that happened in July 2012 and when the new trial commenced in September 2013. Dr. Shapiro formed an opinion that the plaintiff was getting worse and that mold was the cause of it. Arbitrarily, the district judge determined that this evidence cannot come in. How do you tell a physician that he's not going to be permitted to testify based on some scheduling deadline that didn't exist because when it came to the retrial, the court never imposed any new deadlines. It took a year and a half for the case to be retried. In that time period, there were no deadlines. There was no new scheduling order. There was no, hey, parties, we're going to set a new trial here coming up soon. Here's 90 days to flesh out any additional discovery, any additional, he didn't do that. And when we asked for, the plaintiff asked for a new scheduling order, the judge said no. The deadlines expired back in 2011. This was a new trial. There was new evidence that had to come in to the extent the court was worried that the defense would not have an opportunity to get alternate evidence, rebuttal evidence, you enter a new scheduling order. The parties were waiting a year and a half for the court to decide that motion for new trial and for the new trial to be rescheduled, an additional 90 days. Did you make clear to the trial judge before the second trial that you were going to introduce evidence as to causation through a treating physician? We made clear to the district court in a motion that Dr. Shapiro had formed opinions throughout his testimony that has changed his opinions. He determined that she's worse and the mold was causing her to be, had caused her condition to deteriorate drastically. And we need to get this evidence in. Please set a new scheduling order. Give the parties 90 days to flesh out the discovery before the new trial. And he denied it without performing any of the necessary analysis for doing so. Ms. Lawrence, thank you very much. Thank you. Stand by for a moment, please. Judge Van Aske, any questions of Ms. Lawrence? I do not have any questions. Thank you very much. Thank you. Ms. Lawrence, can we see you for a second together with Mr. King over here? Sure. Anything you want. Bring yourself over here. Why don't we do that? I didn't want to. think that compounded the error, Your Honor. Once Ms. Taylor was not presented at trial, and once Mr. Lessen did not have the opportunity to compel her appearance, no state agreed to this protocol, right? This is what the judge offered as a suggestion of rectifying the error, where in fact the trial judge compounded the error. That's why there were appellate courts to reverse. The appellate division, recognizing the existence of Crawford, should have reversed. Instead, the appellate division explicitly said that it was not going to follow Crawford. There's no basis for that in law. Instead, the appellate division decided to follow Van Arsdale. Now, the error of the trial court is made even more egregious by depriving Mr. Lessen of his Sixth Amendment rights not once but twice. There's absolutely no basis for what the trial court did, Your Honor, none whatsoever. Let me recap one of your points. What is the testimony that you wanted from Taylor, Amber Taylor, that was not presented in the narrative that was read to the jury? The testimony that was not presented that we would have liked to have, Your Honor, is that her second statement was a fabrication, that it was not true, and that she, in fact... The second statement implicating your client? Correct, Your Honor. Do you have a basis for that statement? Had somebody spoken to her? Or is this just a speculation as to what you might have said? Your Honor, this is what my client's belief is. And, of course, we have the right to present this to the jury. You know, they have a longstanding relationship. The testimony is unrefutable that Mr. Lessen and Ms. Taylor cared for each other. Mr. Lessen was very protective of her. And, frankly, just looking at her statements alone, you can see that her statements throughout are very inconsistent. So there's no basis to believe anything that she said in the second statement any more than there's a basis to believe anything else that she said. Actually, couldn't her absence help you? Because it certainly gave you the opportunity to question the government's actions, removing her, for example, the critical witness to the offense, removing her from the jurisdiction, preventing her live testimony. The only help that I guess her absence could give is having us granted a new trial now. I don't know if that's actually a help or a hindrance. But really and truly her absence would have only been beneficial had those statements not been allowed to come in. Once those statements were allowed to come in, then her absence was, in fact, a huge hindrance. And we subpoenaed her, so... The statements of Amber Taylor, oh, you mean the draft summary that the trial court sort of orchestrated. And her statement... Orchestrated, it was the trial judge's decision that you could present her testimony via a narrative. No, it was, you're correct the first time, Your Honor, it was orchestrated. The court had the statement drafted. The prosecutor had input, the court had input. It was just confounding error upon error. And we did, in fact, subpoena her. So it's clear that the intent is there all along, that her testimony would have been helpful. And moreover, the jury sent a question to the court while it was deliberating saying, why didn't Amber Taylor appear to testify at trial? It's clear that in addition to Mr. Letson, the jury who decided his fate found her testimony would have been relevant and helpful to making a decision on these charges. Judge Prentiss asked you earlier about the two Mirandaz statements. Well, one was Mirandaz, and the other one was a consent-type statement. Yes. What do we make of that? I mean, in terms of harmless error, if you understand my question. So he admitted to these crimes twice. In great detail. Yes, Your Honor. I don't think that those statements, standing alone, are sufficient to say that, you know, he's guilty beyond a reasonable doubt. Your Honor, we believe, again, that these confessions were, first of all, well, first of all, they were obtained on the basis of Amber Taylor's statements. There was no motion to suppress the statements, right? There was a suppression motion and a suppression hearing. Was that an issue before us? Not specifically. No, but the trial court did deny the motion to suppress. The statements were obtained at the request of Ms. Taylor? The, I'm sorry, Your Honor, the warrant for Mr. Lesson's arrest was obtained as a result of Ms. Taylor's statements. Prior to that, the police... The confessions were made voluntarily. They were, Your Honor, in order for, in order because my client desired to protect Ms. Taylor. The first statement that he made to the police was made after giving an easy-eyed caution statement, which is not akin to Miranda warnings. Subsequent to that... He went out of his way to approach law enforcement to make a statement and what appeared to be a confession. He did, Your Honor, but that doesn't negate the fact that Ms. Taylor's statements shouldn't have come in, and his confession standing alone is not sufficient to solidify any of the charges against him. He confessed to these crimes. His confessions were inconsistent. His confessions were incomplete. He just said the bare minimum that he could say to take the blame. What was it that he stopped talking when he was asked about other issues? He admitted to all the essential elements of the murder and the assault of the young child, right? I wouldn't say that he admitted to all the essential elements. He said what he thought he needed to say. That's far from sufficient for the government to prove its case. We can interrupt you and ask you if you have any questions, just in asking? No, you've covered all the questions I would have had. Thank you. Thank you. Thank you, Ms. Boykin. Ms. Salisbury? Good morning. May it please the Court. I'm Kimberly Salisbury, an Assistant Attorney General representing the people of the Virgin Islands in this matter. It's hard to know where to begin. Let's start with the government removing the witness from the jurisdiction. Yes, Your Honor. The government was led to believe by that witness that she was in danger, and her children were in danger, and we assisted a witness in relocating to remove her from that danger. The man she claimed she feared had committed murder, and it seemed like a justifiable reason to assist someone getting out of the territory. There was absolutely no prejudice. The defendant was perfectly capable of subpoenaing or filing a material witness affidavit where they determined the wrong impression that they couldn't do that is beyond me. Were they told of the whereabouts of this witness? Yes, they were told she was in Florida. It was never hidden from the defense. What I believe happened, and what seems clear, is that the defense was scrambling prior to trial. Two of the issues presented for review show that the defense was scrambling. They were looking for a motion to continue to get a DNA expert, and they also couldn't find one of the witnesses at the last minute that they wanted to testify. This was not going to be a witness for the prosecution, and that's what's vitally important in this case. But the power and ability to produce the witness was within the government. Isn't that accurate? If the government needed to produce the witness, Your Honor, but the government had no plan to produce this witness to testify. They didn't need this witness to testify. There was an abundance of evidence, including, as you've already mentioned, the two confessions from the defendant. Was there any discussion before the trial judge from the defendant about the need to have Ms. Taylor produced? Yes, there was. And the assistant attorney general informed both the judge and defense counsel that they could easily subpoena the witness in Florida or issue a material affidavit. It must be a mistake, and I thought the trial judge said, we have no subpoena power over this witness. She was under that mistaken impression. I don't know where that came from, Your Honor, but she was also under the impression. She said that. Once the judge says, we have no subpoena power, we cannot produce this witness, what's a defendant supposed to do? Well, it's incumbent on the government to correct a mistake like that by the judge. And, Your Honor, he did. And there is evidence in the appendix that is cited in my brief where he specifically told the judge that we've done this in other cases and you can issue a material witness affidavit. That's all in the record. The government informed both the defense counsel and the trial judge that this person could be subpoenaed and could appear to testify. For some reason, they didn't believe him or they chose not to do so. There is also evidence that the judge did not believe that this testimony was going to help the defendant. She thought that it proved motive for the defendant and said it was not favorable. That's also all in the record. Is that for the trial judge to decide? No, Your Honor. It didn't go right to the heart of the defense. The homicide was committed in order to protect Ms. Taylor, whether true or not. That's why he confessed. That was at the very heart of the defense. So that witness was about as crucial a witness as the defense could have. I must be misunderstanding, Your Honor, because in my mind and I believe in the trial judge's mind, this was going to prove to be another point of clarification as to why he committed all of these crimes as opposed to exonerating him in any way whatsoever. It would have shown... His defense in part was that he didn't commit the offenses. He went and actually made a confession because he wanted to protect her. I say whether true or not, that was part of the defense's defense. Or not, being the fatal piece of information there, Your Honor. As the district court... As a matter of fact, didn't the jury come out and say, What about Ms. Taylor? Where is she? They did ask that question, and that was a logical question since they had read all of her testimony prior to deliberation, which was something that the defense... Let's talk about that. Yes. What do you make of the judge, and I think the opposing counsel used the term orchestrating, and what do you make of that whole protocol? Is it troubling? Your Honor? Yes. It is troubling that neither the defense counsel nor the trial judge saw fit to subpoena this witness. It is also troubling that the defense counsel didn't object to the reading of the testimony if they now find it so troubling. That, I believe, is invited error. They didn't object at the time. They drafted it, and they submitted it. I thought what was troubling, I got the impression from the question, is that the trial judge got involved in the drafting of what was to be read to the jury. Well, Your Honor, I believe they were redacting certain information. Actually making corrections of what was to be read to the jury. So that it wouldn't be objectionable, but it was objectionable from the start if they, well, as they are now claiming that it hurt their case. At the time, they thought it was going to help their case, and that's why it's invited error, Your Honor, and shouldn't be on appeal in the first place. Moving on. One of the other issues they've brought up for appeal. I just remember reading that the trial judge had made a comment about Ms. Taylor, something to the effect of, I think she's involved in this. Does that sound familiar to you? No, Your Honor. She's involved in this? Yes. She may have been referring to the theft that occurred prior to the murder? I don't recall seeing that, Your Honor. I'll check my notes, but I thought that the trial judge had made a comment. It was a very negative comment about Ms. Taylor. Well, like I said, Your Honor, the trial judge did not seem to believe that her testimony would help the defense, and there was an abundance of evidence that helped the jury find Mr. Letsom guilty. In addition to his confessions, there was physical evidence, DNA evidence, that was presented to the jury. So his confessions were corroborated, as would be necessary. But I don't recall those comments, Your Honor. I'm sorry. So do you agree that the judge erred with respect to the protocol with which Ms. Taylor's evidence was presented to the jury? Yes, I do. But I believe that error is harmless, and that the harmless error standard does apply in this case because this is not a structural defect. The U.S. Supreme Court has never declared it to be a structural defect. Did the prosecutor have information as to the precise location of Ms. Taylor in Florida? Not the precise location, unfortunately. I believe the evidence shows that the government assisted her in purchasing a plane ticket to Florida for herself and her children, but they did not know exactly where she was living after she arrived. But there was evidence in the record that they did help her relocate to Florida. This may be something you may not have an answer to, but I was a little concerned about the fact that the appellate division, which reviewed the conviction in this case, took seven years to issue it. I was wondering, what if we were to reverse this case and there'd be a trial? It would mean that Mr. Letsam would have to spend seven years in jail on a case that might very well be reversed. How did that happen? Is this usual? It takes seven years for an appellate court to issue an opinion? Unfortunately, Your Honor, I don't know why it was so long. I have the opinion right in front of me, and it said it was considered in 2010, and then the opinion was filed in 2015, so I think it was five years. It was considered in 2010, but it was fully briefed two years before. It was ready to be decided. That's entirely possible, Your Honor. No, I don't know the answer to that. Okay. I think we've covered, through much of the discussion, the fact that there was sufficient evidence to convict. What about the counsel's argument that they were prejudiced by the judge not granting the continuance to allow their expert to verify or contradict or challenge your DNA evidence? Again, Your Honor, I believe that they were aware that the DNA analysis was being done, and as you all may be aware, it is very difficult in the Virgin Islands to get these kinds of analysis done. It's all sent off island, and we are at the mercy of the labs in Florida, and so it is no one's fault how long it takes for it to come back, but the defense was well aware from March, and the trial wasn't until August, that this was going to be an issue. They had plenty of time to procure an expert of their own, who then would have had, yes, two weeks, but time, because he would have known it was coming, to review the analysis, and then they wouldn't have needed a continuance, and obviously that's what the judge felt as well, that this continuance was not necessary and was through no fault of anyone but themselves. What about the amendment of the charging documents? Counsel didn't talk about it, but I know it's an issue in this case. It is one of the issues that was raised, but I believe it's meritless, Your Honor. The information is allowed under the Criminal Procedure Rule 7E to be amended prior to the verdict. They were on notice as to all the charges. All the charges that were listed there, they were all in bold. It was a minor, it was nothing additional, it was just a minor amendment, and they weren't prejudiced in any way whatsoever. So despite the fact that everyone seemed to believe, the judge and the attorneys, that Ms. Taylor could not be subpoenaed, that turned out to be incorrect. Yes, Your Honor, and like I said, the prosecutor didn't believe that he couldn't or she couldn't be subpoenaed, and he did try to make the defense counsel and the judge aware of that. And like I said, I cited to the appendix where Your Honors can read that he specifically said she can be subpoenaed, that we've done this in other cases, Your Honor. The people made an effort to inform the defense and the judge. It's Joint Appendix Volume 3, page 667, that she now lived in Florida and that she could be subpoenaed. Yes, and I think it's 669-670, Attorney Basin identifies prior instances where they brought in witnesses from Florida. Again, counsel didn't touch on it, but she mentioned it. What's the government's position with the sentence? As you would imagine, Your Honor, we do not believe the sentence was excessive. We certainly don't believe that there was anything to remand. All of the sentences were within the statutory minimums, and some of them were even merged together. The gravity of the offense here certainly equals the severity of the sentences. We don't believe there was anything to reverse on that matter. If there's nothing further? Okay. Thank you very much. Thank you. Thank you. Ms. Boykin? Good morning again. I believe it was your question, Judge Flint, where you said that the trial court may have said she's involved in this. The trial court did, in fact, say that. I believe it was before the jury. She stated that she is a central figure in this case. Yes. At that point, the trial court was admonishing the prosecutor, inquiring as to why charges had not been filed against Ms. Taylor. That wasn't something that was done at the trial or in the hearing of the jury. And another issue the government asserts is that Ms. Taylor was in Florida, so we could have subpoenaed her. We can't issue a subpoena in the state of Florida. We need to know where Ms. Taylor is. Florida's a pretty big state. I'm sure there are counties there that have greater populations than the entire Virgin Islands. Once the government sent her there and didn't bother to keep track of her location or have her location and didn't reveal it to the defendant, that made it impossible for us to subpoena her. Next, it was clearly improper for the trial judge to allow the amendment of the information on the morning of jury selection. What's the prejudice as a result of that? The prejudice was the fact that Mr. Letson didn't have sufficient time to prepare to defend those charges. New charges were added in the trial court's judgment and commitment. She specifically states that without the essential elements, no crime is alleged. Rule 7 only permits amendment if no new crime is alleged. The trial court's ruling is inconsistent with the Federal Rules of Criminal Procedure that is stated in its own judgment and commitment. Second was the issue with the sufficiency of the evidence, Your Honors, for Count 11. Again, there was no finding that arson being committed at nighttime means... It's 4 in the morning, right? Correct. Yes. There's no evidence. There was nothing to suggest that 4 a.m. is the nighttime. The only cases in this jurisdiction that have dealt with that dealt with cases before midnight, and there was no evidence presented that this arson occurred before midnight. In fact, all the evidence showed that it was committed around 4 a.m. Boykin, thank you very much. Thank you. Thank you both for well-argued cases. We'll take the matter under advisement. We'll call the next case. VI Derivatives v. United States of America. Thank you. Good morning, Your Honors. My name is Nathan Dershowitz. I'd like to reserve three minutes of my time, if that's okay. Any questions? In my allotted time, I'd like to try to address two issues, both of which I think need both simplification and clarification. They are the District Court's race judicata and final judgment decision, and then Judge Srebrenica's decision in Petaluma, and I think both need clarification. With respect to Judge Sanchez's decision on race judicata, he basically avoided the substantive question that's before this Court, and that was before him, and he did so by initially stating a principle of law, which the IRS spends a lot of time on, on the brief, but we don't contest at all in the context of this case. That statement is that when a federal court proceeds to final judgment on the merits, however, the final judgment has race judicata effect, in a subsequent proceeding and may, in any collateral attack, based on the lack of subject matters, jurisdictions are barred. We're not contesting that principle of law. What we are seriously contesting is the other statement made by the judge, which was that notwithstanding the Third Circuit's partial reversal of this Court's judgment, there could be no doubt that the Third Circuit's presidential decision constituted a final judgment on the merits for these consolidated appeals. Judge Sanchez and the IRS are disregarding the fact that the prior residency case, which I argued, involved the consolidation of appeals from a number of judgments below, all of which were inextricably intertwined with the residency decision. The reversal, in part, by this Court, therefore, required that these prior judgments be modified, amended, or in a couple of cases, maybe even affirmed, but something had to be done by the district court, and the district court understood that. Let me be very specific as to what needed to be done. It's actually a complicated case, perhaps because of the many proceedings involved, but I was reading along with you in your recitation, which apparently comes from Chemical Lehman Tank Lines. You read it almost word for word. It seemed to me that this is the end all, and this really decides the case completely, because if it is res judicata as to all prior proceedings, it seems to me you're done, because the final judgment is folded into the final decision of the Court, and there's nothing left to litigate. But there are outstanding major questions. For example, the Virgin Islands had filed its own actions against the FPOS. Judge Sanchez dismissed all of that, because he found that all five of the members of the Vento family were not residents of the Virgin Islands. All five. That's what he found. Correct. And this Court reversed as to two, finding that Richard and Lana, the parents, were residents of the Virgin Islands. So the decision, the judgment that dismissed that had to be modified, because right now if that decision was final, the Virgin Islands gets no money. Yes. And it's all consolidated in the appeal with respect to residency, because there were all preconditions of it, and specifically, very specifically, in the notice of appeal, these prior decisions, prior judgments, were part of the notice of appeal, and specifically consolidated. If you look at the number on the top of the decision with respect to residency, it lists all these numbers, because they had to be there. Let's take specifically the judgments that were entered in this case. You're not now trying to re-litigate the residency issue. I'm not trying to re-litigate anything. The core question, Your Honor, which underlies everything, is who do they pay the taxes to, each of the people? Do they pay it to the Virgin Islands, or do they pay it to the IRS? Judge Sanchez said it all goes to the IRS. Nothing goes to the Virgin Islands. This Court split it, and so something had to be done with the judgments, the prior judgments, which gave it all to the IRS, and nothing to the Virgin Islands. Otherwise, the Virgin Islands will never be able to collect, because of the judgment throwing out their case, and the IRS has a judgment which entitles them to collect not only from the three girls, but also from the two people who are not residents of the Virgin Islands. What are you asking us to do? Well, what I'm asking you to do first is to reverse with respect to the finality question, and raise judicata. Judge Sanchez's order? Yes. That, I think, has to be done, because what he's mistaken on, and what the IRS is mistaken on, it's not a collateral attack when a case goes up on appeal. There's a reversal in part. It's sent back to a district judge. The district judge knew that things had to be done. He issued an order saying, let me know what I have to do. The IRS says you have to issue new judgments and modify some of the judgments, and then we make a motion at that time to dismiss on jurisdictional grounds. So it's timely, and it's not a collateral attack. It's part of the direct appeal. Has the jurisdictional issue been resolved? He refused to touch the jurisdictional issue. The Vento decision. Didn't the Vento speak jurisdiction? I'm sorry, didn't the Vento? Didn't the Vento decision speak that you had found jurisdiction? No, no, no. No? No. All it did was it dealt with a narrow issue of residency. In the opinion, don't they say we have jurisdiction over this matter? Well, again, there's a big difference between saying we have jurisdiction when no one challenges jurisdiction. And if you look at the Petaluma decision, the court is very good on that aspect of the decision, saying just because you note that you have jurisdiction doesn't mean that you cannot challenge the substantive subject matter jurisdiction. There's a unique aspect here, and let me try to give you an analogy to try to make it clearer. Can I ask a question before I lose my thought on this? Sure. In a case like the Vento decision, the Vento decision decided that the three sisters were residents of the United States. Correct. And that Mr. and Ms. Vento were citizens of the Virgin Islands. Correct. Did that decision ever appeal? That decision is a petition for rehearing. The decision of the court of appeals that was part of this decision, so that pretty much decides the issue of residency. Correct. And, therefore, what you have to do is correct the other judgments that have been entered predicated upon that, and that had to be done by the district court. District court had to come up with an order now which says with respect to, you know, the Virgin Islands application of its FPA with respect to these LLCs, it's incorrect to hold that Dick and Lana are not residents of the Virgin Islands, which is what he held. Is it Judge Sanchez's decision has to be corrected? It has to be. You can either do one of two things. One is you can remand for him to address the substantive issue, or we suggest in our papers that since it's all been briefed and it's a legal issue, you can address it ab initio by this court. That's a question of judicial economy, and it's a question of the attitude that this court has. If you want the trial judge to first give you an opinion, you remand it, let him make a decision. If you say it makes no difference because it's a matter of law, you can address it on your own. And that's completely up to the discretion of the court. My preference would be since you have everything decided, but that will work where you don't have to do the work. So I understand the reality of the situation. But what I was trying to specifically address for one moment is that there are two steps in this process. There's a partnership step, and then you get to the partner step. You have to have the partnership step resolved. You asked the question as to whether or not there was jurisdiction, and I was going to give you an analogy. Let's assume you get a ticket from a Philadelphia police officer returnable in the Philadelphia courts, but it's issued while you're outside of Philadelphia. The way this structure is, you have jurisdiction to go to the Philadelphia city court saying you have to dismiss this because the officer had no jurisdiction to issue the ticket outside of Philadelphia. That's essentially the way the structure is. It's strange. But that's the structure in terms of the code. It says you have to file within 90 days a challenge to the FPOS. Then if you go through the whole structure of it, you can then challenge the subject matter jurisdiction in that court for an ultimate determination that you didn't have jurisdiction, the IRS didn't have jurisdiction, and that the district court didn't have jurisdiction, analogous to the situation that I described. Let me just quickly jump over to Judge, the decision in Petaluma, because the judge is highly regarded, but there is a part of that decision that just simply makes no sense. And what he did, and I'll summarize it very quickly, he did two things. One, the issue had never been raised by any of the parties. You know, he decided that this is the answer, and none of the parties addressed it. It never was raised before. And he basically said that when you have a statute, when the statute says it becomes effective October 4, 2001, and then it says C, the prior temporary regulations, he said, ooh, that's an incorporation by reference. Well, the word C is normally not an incorporation by reference, particularly when the statute says that the whole section becomes effective October 4, 2001. And then you read the preamble, which we cite, and the preamble makes it crystal clear that this is not an incorporation by reference. The IRS believed that the temporary regulations were valid. So they would never suggest you incorporate by reference. They're saying they're valid. And so you're in a situation where you incorporate by reference when no one thought that that was incorporated by reference. And then he does something which is also a little bit unusual. And he says, well, they also said that they eliminate the prior temporary regulations. What is unusual about that is if these regulations, temporary regulations were still in effect, you don't eliminate them. You incorporate them, and you make them part of the new regulations. No, they've been eliminated. So I strongly suggest if you look at the first part of his decision in Petaluma, it makes a lot of sense, and it's well done. But when he goes off without the benefit of briefing and arguments by counsel, and my humble opinion, briefs and arguments by counsel have some value, they sometimes stop a judge from going off on a frolic and detour. And that's what happened here. He went off trying to find a reason, and it's been criticized by a number of legal scholars because it just doesn't have any basis in the legal principles that apply to tax issues. Thank you very much. You've saved some time for rebuttal. Ms. McLaughlin. May it please the Court, good morning. For the record, my name is Theresa McLaughlin, and I represent the United States. The government's position is that the district court was correct in refusing to reopen this matter. What about the unattended business, as it were, that Mr. Pershaw was referring to? The unattended business? Well, Judge Sanchez still needed to do some things or decide some issues. Well, when the case came back, including, well, I should back up, on appeal the government's position was that nothing needed, that even if there was a reversal, nothing needed to be done to the final judgment, except accepting the FPAW's merits adjustments and conceding the penalties because the government's position in its brief in the residency case was that the FPAW, the federal FPAW, could still stand. The other side thought it shouldn't, but on the last page of its opinion in the residency case, this court said we don't need to look into the residency of the federal FPAW case because that will follow with the residence of the individual partners. So when the... The two partnerships, the essential partnerships. Yes. The owners of the two partnerships? No, let me let you answer the question. Okay. Who were the owners of the partnerships? Well, there were LLCs. The general partner of VI Derivatives LLC was VIFX, and the Vento parents were, I think they owned either VFIX or an entity behind, upstream of VIFX, but also there were LLCs that were formed for the benefit of the Vento daughters who were determined to be residents of the United States. So our position is that the first, the final judgment in the FPAW, final judgments, plural, were raised judicata. Whether in... Is that correct? I don't know, Your Honor, because what the FPAWs did in this case were, the essential thrust of them was to declare that the partnerships were a sham, and once you get rid of, sorry, a sham partnership, then it's the LLCs or the individuals behind them who are conducting the transactions. So... But there was, in my recollection, there was a concession. Yes, we owe these taxes. Oh, they conceded that the transactions did not create the loss. This was an abusive tax shelter that's called Son of Boss, and the LLCs and taxpayers conceded that these transactions, these offsetting transactions in market-linked deposits did not create a loss. So anyway, our position is that those initial judgments that were entered and then were appealed are preclusive and final, because the federal rule is that once, you know, a final appealable judgment is entered, which unquestionably happened, that has preclusive effect even while it is on appeal. So this attempt to reopen the case now is a collateral attack that can only be done under 60B4, Rule 60.  Is that no judgment, no final unappealable judgment has been entered? Well, when the case got back to the district court, the district court said, and there are several cases, not just the federal FBAW cases, what, if anything, do I need to do, what needs to be done to dispose of these cases in light of the mandate, which is a reasonable question. And he asked the parties to tell him, and the government's position was, I think I'm mixed up just at the moment about whether this is the government's position or their position. Oh, the government's position, which is at JA 287, was that all issues have been resolved and that the court can enter final judgment. And even the taxpayers' positions, which is at JA 293, respecting these two cases, were confirmed resolution of all issues raised in proceedings in FPAW. So there wasn't really too much disagreement that these cases were basically over. Before the district court, and the district court may want to do something, like saying these cases are closed. And it's true, it hasn't done so. But that doesn't detract from the preclusive effect of the judgments that already went up on appeal and where the courts, they could have in those direct appeals, the other side could have challenged the subject matter jurisdiction of the court, but they didn't. They conceded it. And the court found, I think at page seven of its opinion, that there was jurisdiction. The vendor residency opinion in this court. And so the initial judgments that went up are preclusive. And the only way the case can be reopened is under the Rule 60b-4 as avoid judgment. Does it say concession made before judgment is made? They invoked, they didn't just submit to the jurisdiction, they brought these cases and they alleged that there was subject matter jurisdiction. But even so, the Supreme Court and this court both think that subject matter jurisdiction, although it can be challenged even on direct appeal, that if you waive it, then you're still precluded. And that has to be right because otherwise every judgment could be reopened as avoid judgment. When it's clear under the cases under Rule 60b-4 that there has to be, that it's a much more limited question that it's not whether there's a mere error in the exercise. Can you refer to the explicit words that were used when a subject matter jurisdiction was waived? Are you saying it was waived by not objecting to the court's jurisdiction or was it waived because there was an explicit statement by one of the parties that subject matter jurisdiction was waived? Well, in these cases, there was an express admission that there was subject matter jurisdiction in the district court. But the cases also say that even if you don't admit it and you merely waive it, by the time you get to the end, you can't collateral. It is res judicata. Do you waive it by not objecting to it? Yes, you can. And the Supreme Court said so in the Chico County Drainage District case. And this court has said so, I believe, in the Marshall and Hodge cases. All right.